**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BRIAN WATERMAN,
                    Plaintiff,

v.                                                      Civil Case No. 23-3182-DDC-RES

GORDON HARROD, et. al.,
                    Defendants.

**KDOC DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

Kansas Department of Corrections Defendants Jennell Buchanan, Nicole Scolari, and

Zachary Little (the "KDOC Defendants"), all of whom are sued in their official and individual

capacities, by and through undersigned counsel, request that the Court enter summary judgment in

their favor and against Plaintiff Brian Waterman ("Mr. Waterman" or "Plaintiff") pursuant to Fed.

R. Civ. P. 56.

### I.        Statement of the Matter Before the Court and Relief Sought

Plaintiff Brian Waterman ("Mr. Waterman" or Plaintiff") claims, pursuant to 28 U.S.C. §

1983, that KDOC Defendants violated his Eighth Amendment right to be free from cruel and

unusual punishment by showing deliberate indifference to a serious medical need—his shoulder

injury. Specifically, Mr. Waterman Claims that KDOC Defendants forced him into a top bunk and

failed to use extra links in his restraints, causing him further injury and pain.

KDOC Defendants request the Court to enter judgment in their favor and against Plaintiff,

because there are no issues of material fact and Defendants are entitled to judgment as a matter of

law.

### II.       Statement of Uncontroverted Material Facts ("SUMF")

The following facts are uncontroverted for purposes of this motion only.

1

*Exhaustion of Available Administrative Remedies*

1. In March of 2025, KDOC Corrections Manager II Darcie Holthaus reviewed the KDOC's records for any grievances or Form-9 documents filed by Mr. Waterman mentioning medical care relating to Mr. Waterman's shoulder or medical restrictions for alternate restraints or a bottom bunk. (Ex. A, Holthaus Aff., at ¶¶ 1–2.)

2. A Form-9 is an inmate request to a staff member. (Ex. B, Austin Aff., at ¶ 6.)

3. On August 1, 2023, El Dorado Correctional Facility ("EDCF") Warden Tommy Williams received an "Emergency grievance" from Mr. Waterman relating to medical care. (Ex. A, Holthaus Aff., at ¶ 3.)

4. Warden Williams responded that the grievance was not an emergency and was being forwarded to Centurion of Kansas, LLC ("Centurion"), the KDOC's contractor providing comprehensive health care services for offenders, for response. (Ex. A, Holthaus Aff., at ¶ 4.)

5. On August 21, 2023, Mr. Waterman filed grievance number 274718261 relating to a bottom bunk restriction. On November 16, 2023, Mr. Waterman was sent a message that said "Time has elapsed. Please re-submit if the issue has not been resolved and or is still relevant. Thank you." Mr. Waterman did not resubmit the grievance, and did not appeal it, so his grievance was closed. (Ex. A, Holthaus Aff., at ¶ 5.)

6. Also on August 21, 2023, Mr. Waterman filed grievance number 272037411 regarding a handcuff restriction, but he did not appeal that grievance to the warden at his facility. (Ex. A, Holthaus Aff., at ¶ 6.)

7.  On or about September 11, 2023, Mr. Waterman filed a handwritten "Appeal of Grievance to Secretary of Corrections" and other documents relating to his medical care without first appealing any grievance to the warden at his facility. (Ex. A, Holthaus Aff., at ¶ 7.)

8.  On October 13, 2023, Mr. Waterman received an "Unofficial Grievance Response" that was also sent to Centurion's Regional Medical Director, and the onsite Health Service Administrator stating that Mr. Waterman's treatment plan was appropriate. (Ex. A, Holthaus Aff., at ¶ 8.)

9.  On December 18, 2023, the Secretary of Corrections received a grievance appeal from Mr. Waterman mentioning his shoulder injury, alternate restraints, and medical care. (Ex. A, Holthaus Aff., at ¶ 9.)

10. On December 19, 2023, KDOC staff sent a memo to the Warden noting that there was no evidence that Mr. Waterman sought assistance from staff at his current facility. (Ex. A, Holthaus Aff., at ¶ 9.)

11. Mr. Waterman did not appeal any of his grievances to the Warden of his facility, a prerequisite to appealing to the Kansas Secretary of Corrections. (Ex. A, Holthaus Aff., at ¶ 11.)

12. Mr. Waterman did not timely appeal any grievance to the Secretary of Corrections. (Ex. A, Holthaus Aff., at ¶ 11.)

*Mr. Waterman's Injury and Bottom-bunk Restrictions*

13. Mr. Waterman is an inmate in the custody of the Kansas Secretary of Corrections. (Doc. 24 at 4.)

14. Mr. Waterman first sought medical attention for right shoulder pain in July of 2022 (Doc. 24, at 6.)

3

15. On August 15, 2022, Mr. Waterman was placed on a bottom bunk (BB), bottom run (BR-no stairs) restriction. (Ex. C, Shearburn Aff., at ¶ 4.)

16. Medical restrictions, including bottom-bunk restrictions are typically determined by health care professionals, and KDOC officials enforce restrictions, subject to facility security and safety concerns. (Doc. 24, at 9; Ex. C, Shearburn Aff., at ¶ 5–6.)

17. Relevant to this matter, Mr. Waterman lived at EDCF from January 23, 2023, to October 3, 2023. (Doc. 24, at 4. Doc 24-1, at 2.)

18. Mr. Waterman was housed in the A2 cellhouse at EDCF. (Doc. 24-5, at ¶ 5.)

19. Defendant Zachary Little was a corrections counselor 1 in the A1 cellhouse at EDCF at all times relevant to this matter, while Mr. Waterman was in A2 cellhouse. (Doc. 24-5, at ¶¶ 4–5, 8.)

20. Defendant Zachary Little had no contact with Mr. Waterman, and no control over his medical restrictions. (Doc. 24-5, at ¶¶ 8–10.)

21. Designated KDOC officials, including an inmate's Unit Team, have access to the Offender Management Information System ("OMIS"), a data system used by the KDOC to track offenders through their correctional experience. (Ex. C, Shearburn Aff., at ¶ 7.)

22. The OMIS is where KDOC officials, and specifically the resident's Unit Team, find information about whether an inmate has a bottom-bunk restriction. (Ex. C, Shearburn Aff., at ¶ 8.)

23. The OMIS includes a designation for "Living unit assignment" where an inmate is either designated Y (yes) or N (no) for "Bottom bunk". (Ex. C, Shearburn Aff., at ¶ 9; Ex. D, OMIS Records, at 2, 4, 7–9.)

4

24. On May 17, 2023, Kirbie Shearburn, a KDOC Classification Administrator, asked for clarification about Mr. Waterman's bottom bunk designation, noting that she did not see any medical restrictions justifying the designation. She was trying to transfer Mr. Waterman to another facility and the designation was "hurting" her ability to do so. (Exhibit E, Unit Team Emails.)

25. Dr. Harrod responded that he could see no reason for the bottom bunk restriction, noting that the restriction would be removed. (Exhibit E, Unit Team Emails.)

26. On May 17, 2023, medical personnel removed Mr. Waterman's bottom-bunk, bottom run restriction. (Ex. C, Shearburn Aff., at ¶ 10.)

27. On May 17, 2023, Mr. Waterman's OMIS record was updated to "N Bottom bunk." (Ex. D, OMIS Records, at 2.)

28. The OMIS also has places where an inmate can be exempted from various activities like: "Prolonged crawling, stopping, running, walking, bending or standing"; "Strenuous physical activity for periods in excess of [insert hours or minutes]"; "Handling/lifting heavy materials in excess of [insert] pounds"; "Overhead work for a period in excess of [insert hours or minutes]." (Ex. D, OMIS Records, at 1, 3, 5, 6, 8–9.)

29. At all times relevant to this case, Mr. Waterman's record noted "N" next to each of these categories. (Ex. D, OMIS Records, at 1, 3, 5, 6, 8–9.)

30. Defendant Nicole Scolari was a corrections counselor 1 at EDCF. (Doc. 24-6., at ¶ 3.)

31. Mr. Waterman was part of Ms. Scolari's case load from May 19, 2023, to October 3, 2023, when he transferred to Lansing Correctional Facility ("LCF"). (Doc. 24-6, at ¶ 4.)

32. On June 9, 2023, a note was added under a category titled "Other". The note stated, "Long cuffs recommended." The bottom bunk living unit assignment remained marked "N". (Ex. D, OMIS Records, at 3–4.)

33. The KDOC does not place multiple inmates with bottom-bunk restrictions in the same cell—this ensures that known restrictions are not violated. (Ex. C, Shearburn Aff., at ¶ 11.)

34. On August 1, 2023, an inmate with a bottom bunk restriction was moved into Mr. Waterman's cell, so Mr. Waterman, who did not have a bottom-bunk restriction at that time, was required to move to the top bunk. (Ex. C, Shearburn Aff., at ¶ 12.)

35. On August 3, 2023, the note under the "Other" category, was amended to read "Long cuffs recommended . . . Bottom bunk restriction recommended through November 3, 2023, due to waiting to see ortho for shoulder pain." The bottom bunk restriction remained marked "N". (Ex. D, OMIS Records, at 5–7.)

36. On August 3, 2023, Mr. Waterman's Unit Team Supervisor emailed others in the unit about Mr. Waterman's restriction, stating "Corizon Knipp is going to be putting him back on at least bottom bunk." (Exhibit E, Unit Team Emails.)

37. On August 7, 2023, the Unit Team Supervisor emailed: "On the OMIS Subsequent Medical Classification first screen it shows this, Bottom Bunk Restriction Recommend through November 3, 2023 due to waiting to see ortho for shoulder pain. But, if you go to the next screen that shows bottom bunk restriction it is not marked. Thoughts?" (Exhibit E, Unit Team Emails.)

38. The Classification Administrator responded, suggesting the unit team check with the doctor. (Exhibit E, Unit Team Emails.)

39. That same day, the Unit Team Supervisor emailed Dr. Harrod requesting that he "look at Resident Waterman . . . and his bottom bunk status" for clarification. (Exhibit E, Unit Team Emails.)

40. On August 9, 2023, Mr. Waterman had a nurse visit for his shoulder pain and admitted he "voluntarily surrendered his bottom bunk to his cellmate and injured his right shoulder while climbing into the top bunk." (Doc. 24, at 9, ¶ 25.)

41. At the August 9, 2023, visit, Mr. Waterman "discussed . . . changing his recommendation to an actual bunk bottom restriction." (Doc. 24, at 9, at ¶ 25.)

42. On August 9, 2023, Mr. Waterman's record was amended to mark his Living unit assessment bottom bunk designation to "Y". (Ex. C, Shearburn Aff., at ¶ 13; Ex. D, OMIS Records, at 8–9.)

43. On August 10, 2023, Mr. Waterman's unit team contacted the nurses to clarify whether Mr. Waterman should be given a bottom bunk. (Doc. 24, at 10, ¶ 26.)

44. On August 10, 2023, Mr. Waterman's cellmate with the bottom bunk restriction was moved out of the cell so that Mr. Waterman could move back to the bottom bunk. (Ex. C, Shearburn Aff., at ¶ 14.)

45. While Mr. Waterman had a cellmate with a bottom bunk restriction between August 1 and 10, 2023, there was nothing in OMIS affirmatively stating that he had a bottom bunk restriction—to the contrary, Ms. Scolari and Ms. Buchanan believed that medical providers had only recommended that he receive bottom bunk and alternate (extra link) cuffs, because his records stated "recommended" not "required." (Docs. 24-6 at ¶¶ 6–11; 24-7, at ¶¶ 5–8.)

46. Ms. Scolari and Ms. Buchanan noted that Mr. Waterman had a bottom bunk except when another inmate moved into his cell with a "required" bottom bunk restriction. (Docs. 24-6, at ¶ 7; 24-7, at ¶ 7.)

47. The KDOC initiates cell movements in the mornings at EDCF, indicating that the KDOC moved the other bottom-bunk restricted inmate out of Mr. Waterman's cell as promptly as possible following the change in Mr. Waterman's' restriction status. (Ex. C, Shearburn Aff., at ¶ 15.)

48. Other than the time period between August 9, 2023, when Mr. Waterman's bottom-bunk restriction was placed in OMIS and the morning of August 10, 2023, when Mr. Waterman's bottom-bunk-restricted cellmate was moved, Mr. Waterman has had access to a bottom-bunk when his record in the OMIS has indicated a bottom-bunk restriction. (Ex. C, Shearburn Aff., at ¶ 16.)

*Alternate Restraints*

49. The OMIS does not have a place to check a box to indicate "Y" (yes) or "N" (no) for alternate restraints like it does for bottom-bunk restrictions. (Ex. C, Shearburn Aff., at ¶ 17.)

50. The OMIS may include notes about other restrictions or recommendations for an inmate, including alternate restraints. (Ex. C, Shearburn Aff., at ¶ 18.)

51. Mr. Waterman's OMIS record states in an "other" category only that extra length cuffs are recommended. (Ex. D, OMIS Records; Ex. C, Shearburn Aff., at ¶ 21; Doc 24-6, at 11.)

52. Lieutenant Cody Austin is a Residential Housing Unit Lieutenant at EDCF. (Ex. B, Austin Aff., at ¶ 2.)

53. Lieutenant Austin receives and considers requests for alternate restraints at EDCF. (Ex. B, Austin Aff., at ¶ 3.)

54. It is Lieutenant Austin's practice to require any alternate restraint request to come in written format (paper or email). (Ex. B, Austin Aff., at ¶ 5.)

55. An inmate seeking alternate restraints would submit a Form 9 (inmate request to staff member) requesting alternate restraints. (Ex. B, Austin Aff., at ¶ 6.)

56. On occasion, Lieutenant Austin has received a request for alternate restraints directly from facility medical providers based on an inmate's medical condition. (Ex. B, Austin Aff., at ¶ 7.)

57. Once Lieutenant Austin receives a written request for alternate restraints, he visits the inmate in person to do a restraint fit to ensure the requested alternate restraints would still be secure. (Ex. B, Austin Aff., at ¶ 8.)

58. If medical providers are involved with the request for alternate restraints, they also typically attend the restraint fitting. (Ex. B, Austin Aff., at ¶ 8.)

59. If Lieutenant Austin approves alternate restraints, he typically amends a document that is posted outside of each inmate's cell, documenting their name, photo, i.d. number, and if the inmate is approved for alternate restraints, the approval would be noted. (Ex. B, Austin Aff., at ¶ 9.; Ex. C, Shearburn Aff., at ¶ 19.)

60. Lieutenant Austin typically makes the posted printout for inmates approved for alternate restraints a different color than the printouts for non-approved inmates, so that KDOC officers know at a glance whether an inmate is approved for alternate restraints. (Ex. B, Austin Aff., at ¶ 10.)

61. KDOC Officers obtain information about an inmate's approval for alternate restraints from the document posted about each inmate outside their cell. (Ex. C, Shearburn Aff., at ¶ 20.)

62. Lieutenant Austin reviewed his alternate restraint files and the KDOC electronic records for the time period relevant to this matter. (Ex. B, Austin Aff., at ¶ 11.)

63. Lieutenant Austin did not receive a Form 9 request from Mr. Waterman for alternate restraints. (Ex. B, Austin Aff., at ¶ 12.)

64. Lieutenant Austin did not receive a request from any medical personnel to evaluate Mr. Waterman for alternate restraints. (Ex. B, Austin Aff., at ¶ 13.)

65. Mr. Waterman currently resides at Hutchinson Correctional Facility ("HCF"). (Doc. 85.)

## III.    Questions before the Court

1.    The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e(a) requires prisoners to exhaust available administrative remedies in order for the Court to have jurisdiction over any related claims. The Darcie Holthaus business records affidavit (Exhibit A) establishes that Mr. Waterman failed to timely exhaust available administrative remedies, because he did not attempt informal resolution with his Unit Team prior to initiating the grievance process, and then by failing to appeal any grievance to the warden at his facility, and then to the Secretary of Corrections. Should the Court grant judgment for KDOC Defendants?

2.    Qualified immunity protects government officials from claims for money damages when a clearly established constitutional right has not been violated. The evidence does not support a finding that the KDOC Defendants violated any of Mr. Waterman's constitutional rights that were clearly established at the time of the alleged deprivation. Should the Court grant summary judgment on Plaintiffs claims against KDOC Defendants in their individual capacities for money damages?

3.      Eleventh Amendment immunity shields state actors from money damages brought against them in their official capacities—the Court lacks subject matter jurisdiction over such claims. Plaintiff claims money damages from KDOC Defendants in their official capacities. Should the Court dismiss any claim brought against KDOC Defendants in their official capacities?

4.      Typically, prisoner claims against employees at a facility where they no longer reside are moot, because the employees do not have any control or authority over the prisoner. Plaintiff now resides at HCF and the named KDOC Defendants work or worked at EDCF. Should the Court find that Plaintiff's injunctive relief claims are moot?

5.      To be liable under 42 U.S.C. § 1983 for deliberate indifference, Plaintiff must show that a sufficiently serious deprivation of his Constitutional rights occurred, and that each defendant knew there was a substantial risk of serious harm to Plaintiff and disregarded that risk. The evidence does <u>not</u> show that Plaintiff suffered a sufficiently serious deprivation (his restrictions were always followed and met as quickly as possible), and the evidence <u>does</u> show that KDOC Defendants were part of a Unit Team that actively sought to understand and meet Plaintiff's medical restrictions, to the extent they were involved in such decisions at all. Should the Court enter judgment for KDOC Defendants on Plaintiffs § 1983 claim?

## IV.    Argument and Authorities

Pursuant to Fed. R. Civ. P. 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Movants bear the initial burden to show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Then the burden shifts to the nonmovant to show that genuine issues of material fact remain for trial. *Id*. "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Henderson v. Inter-Chem*

11

*Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Mr. Waterman claims the KDOC Defendants violated his 8th Amendment right to be free from cruel and unusual punishment while he was incarcerated at EDCF in El Dorado, Kansas. The claims relate to the care Mr. Waterman received while incarcerated with the KDOC, his request to receive alternate restraints, and to an approximately 10-day period in August 2023, when Mr. Waterman bunked in a top bunk as opposed to a bottom bunk, allegedly exacerbating his shoulder injury. Mr. Waterman sues each defendant in their individual and official capacity and seeks $3,500 in compensatory damages, $3,500 in punitive damages, and injunctive relief (Compl. at 1–3, 9–10.)

### A. Plaintiff failed to exhaust his administrative remedies by failing to appeal his grievances—summary judgment is appropriate.

The PLRA requires an inmate to exhaust all available administrative remedies before filing a federal claim. 42 U.S.C. § 1997e(a). "Beyond doubt, Congress enacted [the PLRA exhaustion requirement] to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). "In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter*, 534 U.S. 516, at 518, Syl. (citing *Booth v. Churner*, 532 U.S. 731, 737 (2001). "In other instances, the internal review might 'filter out some frivolous claims." *Id.* at 525. "And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.* The PLRA's exhaustion requirement is mandatory and does not allow for judicial discretion, "even to take [special circumstances] into account. *Ross v. Blake*, 578

U.S. 632, 632 (2016). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross*, at 648.

Initially, "the burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA lies with the defendant." *See Iverson v. Bell*, No. 16-3102-JTM, 2017 WL 4422646, at *2 (D. Kan. Oct. 5. 2017) (explaining that defendant has the initial burden to show administrative remedies were available to plaintiff and plaintiff did not exhaust.)

Courts in this district have found that a defendant satisfies this initial burden where the defendant provides a Kansas Department of Corrections ("KDOC") records custodian affidavit that explains that the KDOC reviewed the grievance records and found evidence that a plaintiff availed himself of the grievance process but did not complete it. *See Lewis v. Carrell*, No. 12-3112-DDC-JPO, 2014 WL 4450147, at *10 (D. Kan. Sept. 10, 2014) (citing *Sharrock v. Stephens*, No. 10-3210-CM-SAC, 2011 WL 5526444, at * 1 (D. Kan. Nov. 14, 2011) (explaining that where a defendant identified the applicable grievance procedure and attached affidavits from the records custodian stating that the plaintiff did not complete the grievance procedure, defendant satisfied the initial burden to show that administrative remedies were available and plaintiff failed to exhaust them).

There are two avenues to exhaustion in Kansas. These are found in Kan. Admin Regs. § 44-15-101a (grievances) and § 44-16-104a (personal injury claims). The two avenues are distinct. *Lewis*, 2014 WL 4450147, at *6. Article 15 governs Section 1983 claims. *Id.* at *6–*7.
The KDOC Grievance Procedure for Inmates set forth in Article 15 of Chapter 44 of the Kansas Administrative Regulations requires inmates to follow a four-step process: (1) attempt an informal resolution with unit team members; (2) submit a grievance to an appropriate unit team member; (3) submit a grievance to the warden of the facility; and (4) appeal to the secretary of corrections.

*See* K.A.R. 44-15-101(b), (d), 44-15-102(a)–(c). Grievances must be filed "within 15 days of the discovery of the event." K.S.A. 44-15-101b.

Personal injury claims pursuant to K.A.R. 44-16-104a must be filed "within 10 calendar days of the claimed personal injury." (explaining that the "requirement that the inmate submit the claim as described . . . shall apply whether or not the inmate pursues a grievance pursuant to article 15 . . . K.A.R. 44-16-104a(c)).

Exhibit A is a business records custodian affidavit signed by Darcie Holthaus. The Holthaus Affidavit affirms that she searched all KDOC records for filings by Plaintiff relating to a claimed restraint or bottom bunk restriction and found that Mr. Waterman either did not appeal grievances relating to these issues to the facility warden or did not timely appeal the grievances to the Secretary of Corrections. (SUMF 1, 5–6, 11–12.)

The record establishes that there was a grievance procedure available to Mr. Waterman, and that he in fact knew how to avail himself of it. However, there is no evidence that Mr. Waterman completed the statutorily required steps for exhaustion under either Article 15 or 16. There is no evidence that Waterman (1) attempted informal resolution with his unit team (SUMF 10), or (2) that he completed the process of exhausting available remedies by appealing within the statutory time frames to the warden or the Secretary of Corrections (SUMF 1, 5–6, 11–12). Accordingly, judgment must be entered in KDOC Defendants' favor and against Plaintiff as a matter of law for failure to exhaust available administrative remedies pursuant to 42 U.S.C. § 1997e(c).

**B. The KDOC Defendants are entitled to qualified immunity because Mr. Waterman has not shown that his Constitutional rights were not violated, and in any event any such right was not "clearly established" at the time of the alleged violation.**

14

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (2018) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). The Court has discretion to decide which prong of the qualified-immunity analysis to address first. *Id.*

Mr. Waterman alleges that requiring him to move to the top bunk and not providing him alternate restraints in the form of extra handcuff links violated his Constitutional right to be free from cruel and unusual punishment. (Compl. at 2, 5–6.)

The Tenth Circuit "has stated that [o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit Decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (2018) (quoting *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (internal quotations omitted) (explaining that while a case does not have to be on point it does have to place the issue "beyond debate").

Without addressing whether the Constitutional right at issue was clearly established, and without assuming Mr. Waterman's burden to establish both prongs of the test, for all the reasons discussed in Section E below, the KDOC Defendants did not violate Mr. Waterman's constitutional right to be free from cruel and unusual punishment, because KDOC Defendants did not know of Plaintiff's medical needs and then deliberately disregard them. Plaintiff has not demonstrated that any named defendant acted to deprive him of a bottom bunk or any particular restraints. To the contrary, KDOC staff endeavored to determine what Mr. Waterman's needs were and to meet them.

For these reasons, the KDOC Defendants request that the Court enter summary judgment on Plaintiff's claims against them in their individual capacities for money damages.

### C. The KDOC Defendants are entitled to Eleventh Amendment immunity.

To the extent that Mr. Waterman seeks money damages from the KDOC Defendants in their official capacities, they are entitled to Eleventh Amendment immunity. The Eleventh Amendment precludes monetary damages claims by Kansas against Kansas government officials in federal court. *Winter v. Mansfield*, No. 19-3236-HLT-TJJ, 2021 U.S. Dist. LEXIS 184865, at * 2021 WL 4354617, at *2 (D. Kan. Aug. 27, 2021) (citing *Jones v. Courtney*, 466 F. App'x 696, 699 (10th Cir. 2012)); *Payne v. McKune*, No. 06-3010-JWL, 2007 WL 60941, at *1–2 (D. Kan. 2007)). Accordingly, this Court lacks subject matter jurisdiction over claims for money damages against KDOC Defendants in their official capacities. *Id*. The KDOC Defendants request that the Court dismiss Plaintiff's claims against them in their official capacities for money damages for lack of subject matter jurisdiction.

### D. Mr. Waterman's claims against the KDOC Defendants are moot because he resides in a different facility and has a bottom bunk restriction.

Mr. Waterman's request for injunctive relief is moot. Defendants Little, Scolari work at EDCF, Defendant Buchanan is no longer employed by the KDOC but had also worked at EDCF. (Doc. 17, at 3; SUMF 19, 30.) Mr. Waterman now resides at HCF. (SUMF 65.) The named defendants have no authority or control over Mr. Waterman's bunk assignment or restraints used on him at HCF.

Typically, "an inmate's transfer from one prison to another generally renders moot any request for injunctive relief against employees of the original prison concerning the conditions of confinement." *Whitman v. Beagle*, No. 23-3029-JWL, 2023 U.S. Dist. LEXIS 214082, at *6 (D. Kan. Dec. 1, 2023) (citing *Green v. Branson*, 108 F.3d 1296–1299–1300 (10th Cir. 1997), *Love v.*

*Summit Cnty.*, 776 F.2d 908, 910 n.4 (10th Cir. 1985) (explaining that "transfer of inmate to different prison renders his § 1983 claim for injunctive relief moot")).

For this additional reason, the KDOC Defendants request that the Court enter judgment in their favor and against Plaintiff on his requests for injunctive relief.

**E. The KDOC Defendants were not deliberately indifferent to Mr. Waterman's serious medical needs, there is no evidence that they were aware placing him in a top bunk or using regular restraints put him at substantial risk of serious harm, or that they disregarded that known risk.**

The Court could resolve this case based on Plaintiff's failure to exhaust administrative remedies, or on qualified and sovereign immunity and mootness grounds. But should the Court consider Mr. Waterman's deliberate indifference claim on the merits, KDOC Defendants request that the Court enter judgment in their favor for the following reasons:

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

"Prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* (citing *Estelle*, 429 U.S. at 106). Courts apply a two-pronged inquiry with objective and subjective components when deciding whether a constitutional deprivation has occurred. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

17

First, the prisoner must allege the deprivation was objectively "'sufficiently serious' to constitute a deprivation of a constitutional dimension." *Id.* (quoting *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

Second, "under the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d at 1230–31. "[A] prison official cannot be liable 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1231 (quoting *Farmer*, 511 U.S. at 837). Courts have likened the subjective component to recklessness in criminal law, requiring a person to "consciously disregard a substantial risk of serious harm." *Id.* In other words, a plaintiff must show that a prison official subjectively knew the plaintiff faced a substantial risk of serious harm and that the official disregarded that risk "by failing to take reasonable measures to abate it." *Hron v. Jenkins*, No. 98-3237, 1999 U.S. App. LEXIS 5746, at *4–*5 (10th Cir. Mar. 29, 1999) (quoting *Farmer*, 511 U.S. at 847)).

"[T]o survive summary judgment, a prisoner must show the named prison official possessed the requisite personal participation or knowledge, and acted with 'deliberate indifference' to his health or safety." *Dittmeyer v. Whetsel*, 91 F. App'x 111, 117 (10th Cir. Feb. 11, 2004) (internal citations omitted). "Although prisoners must receive humane conditions of confinement, mere discomfort or temporary adverse conditions which pose no risk to health and safety do not implicate the Eighth Amendment." *Id.*

1. **The claims against Mr. Little fail for lack of personal participation.**

There is no evidence that Defendant Little had any contact with Mr. Waterman at any time, let alone that Defendant Little knew about and was deliberately indifferent to a substantial risk of serious harm to Mr. Waterman. Defendant Little was in the A1 cellhouse at EDCF at all times relevant to this matter, while Mr. Waterman was in A2 cellhouse. (SUMF 19.) Defendant Little had no contact with Mr. Waterman, and no control over his medical restrictions. (SUMF 20.) Because Mr. Waterman and Defendant Little had no contact and Defendant Little had no control or potential impact on Mr. Waterman, at any time, Defendant Little requests that the Court enter summary judgment in his favor and against Plaintiff because he had no personal participation in Mr. Waterman's alleged deprivation.

2. **Plaintiff failed to prove his injury was objectively "sufficiently serious" to constitute a Constitutional violation.**

The evidence does not support that Plaintiff's injury is sufficiently serious to meet the objective prong for deliberate indifference. *See Jones v. Bokor*, 443 F. App'x 327, 330 (10th Circuit, Sept. 28, 2011) (noting that the plaintiff had failed to produce evidence showing his shoulder condition was sufficiently serious to warrant a deviation from a palms-out handcuffing procedure), *see also Astorga v. Vick*, No. 15-3191-CM, 2017 U.S. Dist. LEXIS 58847, at *7–9 (D. Kan. April 17, 2017) (explaining that plaintiff failed to show a sufficiently serious injury where he "had no special wrist restraint permissions or restrictions—or at least none of which defendants were aware."). Without proof of a sufficiently serious injury, Plaintiff cannot prove a Constitutional violation. Because Plaintiff cannot meet the objective prong of the deliberate indifference standard, KDOC Defendants request that the Court enter judgment in their favor.

**3.    The claims against Defendants Scolari and Buchanan fail because they did not knowingly disregard Mr. Waterman's serious medical needs.**

While Defendants Scolari and Buchanan did have contact with Mr. Waterman, there is no proof they personally participated in any Constitutional deprivation. There is no evidence that they knew about and were deliberately indifferent to a substantial risk of serious harm to Mr. Waterman.

There is no evidence that Mr. Waterman, or anyone else, provided KDOC Defendants with clear evidence that he had a serious shoulder injury or restriction that was currently mandating specific treatment or modifications to his bunk assignment or restraints.

Designated KDOC officials, including an inmate's Unit Team, have access to the OMIS, a data system used by the KDOC to track offenders through their correctional experience. (SUMF 21.) The OMIS includes a designation for "Living unit assignment" where an inmate is either designated Y (yes) or N (no) for "Bottom bunk". (SUMF 23.) This is where KDOC officers would find information about whether an inmate has a bottom-bunk or alternate restraint restriction or requirement. (SUMF 22.)

Based on the information available to them in the OMIS, Mr. Waterman's unit team was uncertain what Mr. Waterman's needs were and what restrictions or requirements he had. They did not, however, simply throw up their hands. They requested further information.

On May 17, 2023, a KDOC Classification Administrator asked for clarification about Mr. Waterman's bottom bunk designation, noting that she did not see any medical restrictions justifying the designation. (SUMF 24.) Dr. Harrod responded that he also could see no reason for the bottom bunk restriction, noting that the restriction would be removed. (SUMF 25.)

On May 17, 2023, medical personnel removed Mr. Waterman's bottom-bunk, bottom run restriction. (SUMF 26.) On May 17, 2023, Mr. Waterman's OMIS record is marked "N Bottom bunk." (SUMF 27.) The OMIS also has places where an inmate can be exempted from various

activities like: "Prolonged crawling, stopping, running, walking, bending or standing"; "Strenuous physical activity for periods in excess of [insert hours or minutes]"; "Handling/lifting heavy materials in excess of [insert] pounds"; "Overhead work for a period in excess of [insert hours or minutes]." (SUMF 28.) Mr. Waterman's record noted "N" next to each of these categories. (SUMF 29.)

From May 19, 2023, to October 3, 2023, Mr. Waterman was part of Defendant Scolari's case load. (SUMF 31.) On June 9, 2023, a note was added under a category titled "Other". The note stated, "Long cuffs recommended." The bottom bunk living unit assignment remained marked "N". (SUMF 32.)

The KDOC does not place multiple inmates with bottom-bunk restrictions in the same cell—this ensures that known restrictions are not violated. (SUMF 33.) As of August 1, 2023, Mr. Waterman did not have a bottom-bunk restriction, and an inmate with a bottom bunk restriction was moved into Mr. Waterman's cell, requiring Mr. Waterman to move to the top bunk. (SUMF 34.)

On August 3, 2023, the note under the "Other" category, was amended to read "Long cuffs recommended . . . Bottom bunk restriction recommended through November 3, 2023, due to waiting to see ortho for shoulder pain." The bottom bunk restriction remained marked "N". (SUMF 35.)

That same day, Mr. Waterman's Unit Team Supervisor emailed others in the unit about Mr. Waterman's restriction, stating "Corizon Knipp is going to be putting him back on at least bottom bunk." (SUMF 36.) Defendants Scolari and Buchanan were copied on this correspondence.

On August 7, 2023, the Unit Team Supervisor followed up on his email, expressing confusion about Mr. Waterman's conflicting records: "On the OMIS Subsequent Medical

Classification first screen it shows this, Bottom Bunk Restriction Recommend through November 3, 2023 due to waiting to see ortho for shoulder pain. But, if you go to the next screen that shows bottom bunk restriction it is not marked. Thoughts?" (SUMF 37.) The Classification Administrator responded, suggesting the unit team check with the doctor. (SUMF 38.) That same day, the Unit Team Supervisor emailed Dr. Harrod requesting that he "look at Resident Waterman . . . and his bottom bunk status" for clarification. (SUMF 39.) Defendants Scolari and Buchanan were copied on most of the emails relating to Mr. Waterman's unit team investigating what his needs and restrictions were.

These facts demonstrate a couple of things. First, KDOC officers/staff, including, to some extent Defendants Scolari and Buchanan, were trying to understand and meet Mr. Waterman's needs—they did not disregard them. They were not deliberately indifferent to them. Second, they demonstrate that Defendants Scolari and Buchanan did not have the requisite personal participation or knowledge of Mr. Waterman's needs <u>and</u> disregarded that knowledge.

Defendants Scolari and Buchanan knew that Mr. Waterman did *<u>not</u>* have a bottom-bunk restriction when a bottom-bunk restricted inmate was moved into Mr. Waterman's cell. (SUMF 45.) Accordingly, they could not be deliberately indifferent to his need for a bottom bunk.

On August 9, 2023, Mr. Waterman had a nurse visit for his shoulder pain and admitted he "voluntarily surrendered his bottom bunk to his cellmate and injured his right shoulder while climbing into the top bunk." (SUMF 40.) At the nurse visit, Mr. Waterman "discussed . . . changing his recommendation to an actual" bottom-bunk restriction." (SUMF 41.) On August 9, 2023, Mr. Waterman's OMIS record was amended to mark his Living unit assessment bottom bunk designation to "Y". (SUMF 42.)

22

On August 10, 2023, Mr. Waterman's Unit Team contacted medical personnel to clarify whether Mr. Waterman's bunk status. (SUMF 43.) That same day, Mr. Waterman's cellmate with the bottom bunk restriction was moved out of the cell so that Mr. Waterman could move back to the bottom bunk. (SUMF 44.) The KDOC initiates cell movements in the mornings at EDCF, indicating that the KDOC moved the other bottom-bunk restricted inmate out of Mr. Waterman's cell as promptly as possible following the change in his restriction status. (SUMF 47.) Defendants Scolari and Buchanan noted that Mr. Waterman had a bottom bunk except when another inmate moved into his cell with a "required" bottom-bunk restriction. (SUMF 46.) Other than the time period between August 9, 2023, when Mr. Waterman's bottom bunk restriction was placed in OMIS and the morning of August 10, 2023, when Mr. Waterman's bottom-bunk-restricted cellmate was moved, Mr. Waterman has had access to a bottom bunk when his record in the OMIS has indicated a bottom-bunk restriction. (SUMF 48.) This prompt action to comply with Mr. Waterman's bottom-bunk restriction shows that KDOC officials acted immediately to ensure Mr. Waterman's needs were met, not that they were indifferent to them. There is no evidence, other than Mr. Waterman's allegation, that Defendants Buchanan and Scolari were personally involved in the decision to move a bottom-bunk inmate into Mr. Waterman's cell. Instead, the evidence shows that KDOC staff as a whole acted to meet Mr. Waterman's restrictions, not that they disregarded them.

The Tenth Circuit's decision in *Hron v. Jenkins* supports the KDOC Defendants' position. 1999 U.S. App. LEXIS 5746. Mr. Hron claimed that prison officials were deliberately indifferent to his serious medical need to be assigned a bottom bunk. *Hron*, 1999 U.S. App. LEXIS at *2–3. Mr. Hron suffered from diabetes and seizures and was medically assigned a bottom bunk. *Id.* at *2. Mr. Hron was moved to a special housing unit and was assigned a top bunk over his objection.

*Id.* at *2. Two days later he fell from the bunk and broke his right knee cap. *Id.* at *2. Even after surgery to repair his knee, Mr. Hron claimed he was denied a lower bunk restriction and was required to climb flights of stairs. *Id.* at *2–*3.

The Tenth Circuit affirmed the district court's decision granting summary judgment for the prison officials because Mr. Hron failed to provide sufficient evidence to demonstrate that prison officials subjectively knew that he needed a lower bunk due to a medical restriction. *Id.* at *5–6. The Court found that Mr. Hron's sworn declaration claiming he told defendants that "he was medically assigned to a lower bunk" and "needed to be on a lower bunk due to [his] medical condition" were not sufficiently specific to impute "subjective knowledge of a substantial risk of serious harm." *Id.* at *5. The Court noted that Mr. Hron's medical records did not clearly diagnose him with epilepsy until after the fall resulting in his broken knee cap. *Id.* at *5.

Here, Plaintiff fails to allege that KDOC Defendants subjectively knew about his lower bunk requirement and that assigning him to a top bunk disregarded an excessive risk of harm to him. Plaintiff's allegations against the KDOC Defendants are that "UT Little had nurse Knipp discontinue my bottom bunk restriction, UT Scolari an [sic] UTM Buchanan ordered me on top bunk causing me to reinjury [sic] shoulder." (Compl. at 2.)  "UT. Little. UT. Scolari and UTM. Buchanan forced me on top bunk so [another inmate] could have bottom bunk. Threatened me with a slam cell, no phone, tablet, commissary, or property if I did not comply. Even after being informed of the torn muscle, by me and a different nurse. There [sic] actions caused me to reinjure my shoulder shooting pain down to my elbow, climbing up and getting down from top bunk." And that "The Unit Team had a duty not to place two bottom bunk restricted inmates together in the same cell." (Compl. at 5.)

24

As discussed above, the information available to Mr. Waterman's unit team indicated that he did <u>not</u> have a bottom bunk restriction when a bottom-bunk restricted inmate was placed in his cell. (SUMF 27, 34.)

The Tenth Circuit decided it was not sufficient for Mr. Hron to tell prison officials he needed a bottom bunk. Likewise, it was reasonable here for the KDOC officers to rely on OMIS and their investigation into Mr. Waterman's needs when assigning him a top bunk. The Tenth Circuit found this was so, even when Mr. Hron fell from the top bunk and broke his kneecap and was required to be in the top bunk even after his surgery to repair it. Here, the KDOC officials managing Mr. Waterman's living conditions paid attention to his needs, and when his record was updated to again place a bottom-bunk restriction, his cellmate was immediately moved so that Mr. Waterman could have the bottom bunk. (SUMF 42–48.)

For all these reasons, the KDOC Defendants request that the Court enter judgment in their favor and against Plaintiff. The KDOC Defendants lacked personal participation in any deprivation, because they did not disregard any known risk to his health or safety. And in any event, the circumstances of this case are not sufficiently serious to constitute a deprivation of a constitutional dimension.

The same analysis applies to Mr. Waterman's claims relating to alternate restraints. Mr. Waterman alleges that: "[a]t HCF due to [Plaintiff's shoulder injury] medical staff ordered extra length hand cuffs, which EDCF did not follow" and that "[e]ven after medical advised A2 Unit Team Scolari of the order only once or twice was this order followed." (Doc. 17, at 5.)

Unlike a bottom-bunk restriction, the OMIS does not have a place to check a box to indicate "Y" (yes) or "N" (no) for alternate restraints. (SUMF 49.) The OMIS may include notes about other restrictions or recommendations for an inmate, including alternate restraints. (SUMF 50.)

Mr. Waterman's OMIS record states in an "other" category only that extra length cuffs are recommended. (SUMF 51.) When an inmate or medical provider request alternate restraints for an inmate, they must have a restraint fitting to ensure that the requested alteration is still secure. (SUMF 52–58.) If an inmate is approved for alternate restraints, that approval is noted on a piece of paper that is printed and posted outside the inmate's cell with other important information (inmate's photo, name, i.d. number). (SUMF 59.) The posted paper is typically a different color when an inmate is approved for alternate restraints so that officers can tell at a glance whether the inmate is approved. (SUMF 60–61.) The officer responsible for processing requests for alternate restraints, conducting fittings, and posting any approvals reviewed his files and found no request for alternate restraints for Mr. Waterman. (SUMF 62–64.)

While there was some information in OMIS recommending alternate restraints, the KDOC Defendants understandably viewed the note as a recommendation not a requirement. (SUMF 45.) The procedures for requesting alternative restraints had not been followed, Mr. Waterman had not had a restraint fitting to determine the safety of alternate restraints, and Mr. Waterman's printed information sheet therefore didn't reflect the need. (SUMF 62–64.) Under these circumstances, Plaintiff has not shown that the KDOC Defendants were deliberately indifferent to a serious medical need. KDOC Defendants request that the Court enter judgment in their favor.

**D. Conclusion**

Because Mr. Waterman failed to exhaust available administrative remedies, Defendants respectfully request that the Court grant judgment in their favor and against Plaintiff.

Should the Court reach the merits of Mr. Waterman's constitutional claims, the KDOC Defendants request that the Court grant judgment in their favor on Plaintiff's money damages claims because they are entitled to qualified immunity (individual capacity) and Eleventh

Amendment Immunity (official capacity). The KDOC Defendants request that the Court find that Plaintiff's remaining claims for injunctive relief are moot due to Plaintiff's incarceration at HCF, while the KDOC Defendants work (or worked) at EDCF.

Should the Court evaluate Mr. Waterman's deliberate indifference claim, the KDOC Defendants request that the Court enter judgment in their favor because they lacked personal participation in Mr. Waterman's alleged deprivations. They did not consciously disregard a known risk of serious harm to Mr. Waterman. To the contrary, to the extent Plaintiff has shown they had any personal involvement in the decisions about Mr. Waterman's cellmate or restraints, they investigated and abided by Plaintiff's OMIS records relating to medical restrictions at all times.

**WHEREFORE** the KDOC Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff as a matter of law and for such other relief as the Court deems fair and equitable.

<div style="margin-left:50%">

Respectfully submitted,
**STEVENS & BRAND, L.L.P.**

*/s/ Katherine E. Simpson*
Whitney L. Casement #25466
Katherine E. Simpson #26453
4848 SW 21st Street, Suite 201
Topeka, KS 66604
Tel: 785-408-8000
Fax: 785-408-8003
WCasement@StevensBrand.com
KSimpson@StevensBrand.com
*Counsel for KDOC Defendants*

</div>

27

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of March 2025, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court via the CM/ECF electronic filing system, and a copy sent by U.S. Mail, postage prepaid, to:

Brian Waterman #126456
Hutchinson Correctional Facility
PO Box 1568
Hutchinson, KS 67504

/s/ Katherine E. Simpson
Katherine E. Simpson